ELIZABETH DAKE WILSON, et al., v. MRS. KATIE MULLEN.
and
ELIZABETH DAKE WILSON, et al., v. J. B. MULLEN.

Middle Section. February 3, 1930.

Petition for Certiorari denied by Supreme Court, May 30, 1930.

Avery Handly, of Nashville, for plaintiffs in error.
J. B. Daniel, of Nashville, for defendants in error.

FAW, P. J.   Two actions for damages, brought against Miss Elizabeth Dake Wilson, R. Morris Wilson and James Cates, were tried together, by consent, before a jury in the Third Circuit Court of Davidson County, and the trial resulted in a verdict for the plaintiff and against the three defendants in each case.

The two actions arose out of a collision between two automobiles at the intersection of Union street and Sixth avenue in the City of Nashville, about 8:30 o'clock in the evening of October 1, 1928.   One of the cars involved in the collision was a Chevrolet sedan owned by J. B. Mullen and driven at the time by his son, P. H. Mullen. The other of the two cars was a Stutz automobile owned by defendant R. Morris Wilson, and registered in his name, but kept by him mainly for the use of his daughter, the defendant Elizabeth Dake Wilson, nineteen years of age.   Defendant James Cates, a friend and visitor of defendant Elizabeth Dake Wilson, was driving the Stutz when the collision occurred, and defendant Elizabeth Dake Wilson was seated beside him on the front seat.   They were the only occupants of the Stutz.

Mrs. Katie Mullen, the wife of J. B. Mullen, was one of the occupants of the Chevrolet at the time of the accident, and suffered serious and permanent injuries as a result thereof, for which injuries she sued, and, on the trial, the jury found the issues in her favor and assessed her damages at $8500, for which sum the court rendered judgment against the three defendants.

J. B. Mullen sued for the injury to his said Chevrolet car and for loss of services and association of his wife, and for expenses incurred by him by reason of the injuries to his wife, and the jury returned a verdict in his favor and assessed his damages at $4000, and the court rendered judgment accordingly against the three defendants.

The defendants appealed in error to this court from each of said judgments, after their motions for a new trial had been overruled, and the two cases were, by consent of the parties, through their attorneys, and by order of the trial court, brought up by one bill of exceptions and in one transcript, and they have been briefed and argued as one case in this court and will be so treated in this opinion, wherein we will, for convenience, continue to refer to J. B. Mullen and Mrs. Katie Mullen as plaintiffs, and to Miss Elizabeth Dake Wilson, R. Morris Wilson and James Cates as defendants, although the last-named three persons are, in this court, plaintiffs in error and Mr. and Mrs. Mullen are defendants in error.

There are eleven assignments of error. The first assignment is that there is no evidence to support the verdicts returned by the jury, and the second assignment is that "the court erred in overruling defendants' seasonable motion for a directed verdict made at the close of all the evidence."

The first and second assignments, supra, may be considered together, for if there was evidence which required a submission of the case to the jury, over defendants' motion for peremptory instructions, there was necessarily some evidence to support verdicts in favor of the plaintiffs.

The grounds of defendants' motion for peremptory instructions below, as stated therein, were (1) "there is no evidence to support a verdict" (for either of the plaintiffs), and (2) "the uncontroverted evidence shows that, as a matter of law, there was negligence on the part of the" (driver of the) "plaintiffs' car, the Chevrolet, which proximately contributed to the injuries."

In order to decide the questions presented by the motion for a directed verdict, it has been necessary for us to examine both the pleadings and the evidence, for it is a fundamental rule that proof alone is not sufficient to sustain a verdict. The case should not have been submitted to the jury, and the verdicts cannot be sustained, unless there was evidence reasonably tending to prove the negligence alleged in the declarations as the cause of the injuries suffered by

the plaintiffs. Elkin Motor Co. v. Ragland, 6 Tenn. App. Rep., 166, 171, and cases there cited.

The declaration of Mrs. Katie Mullen is in two counts, and the declaration of J. B. Mullen contains four counts; but the alleged negligence on which both cases are predicated is the same, and may be seen from the declaration of Mrs. Mullen, the first count of which (after certain averments concerning the relations of the defendants, respectively, to the Stutz car, with respect to its ownership and operation) contains averments as follows:

"Plaintiff avers that, Sixth avenue and Union street are within the corporate limits of the City of Nashville and have been for many years. Plaintiff avers that on October 1, 1928, between eight and nine o'clock p. m., she was riding in an automobile, being driven by P. H. Mullen and belonging to J. B. Mullen, on Sixth avenue in the City of Nashville going south, crossing Union street, when the defendants Miss Elizabeth Dake Wilson and James Cates, who were in a large heavy automobile were on Union street going east, and they drove and handled the car they were in, and which was owned and in use as above stated, with gross carelessness, great negligence, and so wantonly and recklessly as to run the same into, against and upon the car in which plaintiff was riding, with much force and violence, knocking the car quite a distance and inflicting upon plaintiff, who was wholly without fault, very serious and permanent injuries."

The second count of the declaration of Mrs. Mullen contains averments as follows:

"The defendants as owners or operators of a large, heavy automobile on the public streets and highways of the City of Nashville, are required by law to be watchful and vigilant at all times, and to run the car at such rate of speed in the city and especially at or near street crossings and intersections as not to endanger the public rightfully using the highway.

"And plaintiff avers that Sixth avenue and Union street are public highways and much used by the public, being located in the very heart of the City of Nashville and within its corporate limits. And plaintiff avers that for several years there has been in force in the City of Nashville a City Ordinance reading as follows:

" 'Sec. 5. Be it further enacted that it shall be unlawful for any vehicle to exceed a speed limit of twenty miles per hour within the corporate limits of said city. No vehicle shall exceed a speed limit of ten miles per hour at any crossing or intersections of the streets, highways or other thoroughfares of said city; provided that this provision shall not apply on such streets as are hereinafter designated as "Arterial Highways," and provided further that no vehicle shall exceed a speed of ten

miles per hour while within the confines of any safety or school zone of said city or when turning corners.'

"And plaintiff avers that neither Union street or Sixth avenue is an Arterial highway and was not at the time of the infliction of the injuries herein complained of.

"And plaintiff avers that early in the night of October 1, 1928, the defendants in entering Sixth avenue from the west at the Union street intersection or crossing did so at a rapid and dangerous rate of speed, and as they drove down Union street east into Sixth avenue, they did so at a negligent rate of speed and greatly in excess of the twenty miles per hour limit fixed by the aforesaid Ordinance, and greatly in excess of the ten miles limit fixed by said Ordinance as the maximum speed at crossings, and in doing so they ran their said heavy automobile into, against and upon a smaller car in which plaintiff was riding, but which was being driven by P. H. Mullen, and owned by J. B. Mullen, and as a direct and proximate result of the gross carelessness, great negligence and breach of duty in violating the aforesaid ordinance, plaintiff was seriously hurt and permanently injured."

It appears from the proof, and is not disputed, that there was a collision between the Stutz car owned by defendant R. Morris Wilson and the Chevrolet car owned by plaintiff J. B. Mullen, near the intersection of Sixth avenue and Union street, about 8:30 p. m. on October 1, 1928, and, as a result of this collision, the Mullen car was damaged and plaintiff Mrs. Katie Mullen, an occupant of the rear seat of the Mullen sedan, suffered serious personal injuries.

On the trial below, there was a controversy as to whether the proximate cause of the collision was negligence of the driver of the Wilson car or negligence of the driver of the Mullen car. It was the contention of the plaintiffs that the driver of the Wilson car was guilty of negligence in the manner pointed out in the declarations, and that such negligence of the driver of the Wilson car was the proximate cause of the collision and the resulting injuries to the plaintiffs. It was further insisted by plaintiffs that the Mullen car was not operated in a negligent manner.

On the other hand, defendants insisted that the Wilson car was not operated in a negligent manner, and that negligence of the driver of the Mullen car was the proximate cause of the collision; and further, that, if the driver of the Wilson car was negligent as averred in the declarations, the driver of the Mullen car was guilty of negligence which contributed, as a proximate cause, to bring about the collision, and therefore, the plaintiffs were not entitled to recover.

As a matter of course, under well settled rules of practice in this State, if there was evidence reasonably tending to support the

theory of plaintiffs and defendants, respectively, as. above set forth, it was the duty of the trial judge to submit the case to the jury, as he did, and the verdict implies that the jury resolved all conflicts of evidence relating to the material and determinative issues in favor of the plaintiffs.

It should have been stated that there was some controversy on the trial below as to whether the negligence of the driver of the Mullen car (if it should be found that he was negligent) was or not imputable to the plaintiff, Mrs. Katie Mullen. The trial judge (believing that the evidence on the point was undisputed) resolved this controversy in favor of the defendants, and charged the jury as follows:

"Where a husband furnishes an automobile, and this automobile is being used by the wife, on some mission or business of hers, and the car is being operated by a member of her family, or any one else, as to that, and as in this case, her stepson, this wife would be bound by the negligent act of this person who was operating the car, and if he commit an act of negligence and from his act of negligence an accident directly and proximately follows, then Mrs. Mullen in this case, could not recover.

"Also if he commit an act of negligence that directly and proximately contributed to the accident in question, a person, as Mrs. Mullen in this case, could not recover, and neither could Mr. Mullen recover, under the former as well as this latter statement of law."

We think the instructions above quoted were justified by the undisputed evidence, but whether these instructions be sound in law or not, we must assume that they were obeyed by the jury, and we will consider the case upon the assumption that if there is any evidence of negligence on the part of the driver of the Mullen car, such negligence is imputable to the plaintiffs.

Union street and Sixth avenue intersect and cross each other at right angles. The general direction of Union street is east and west, and that of Sixth avenue is north and south. The Mullen car was traveling southward on Sixth avenue and the Wilson car was traveling eastward on Union street. The driver of neither of the cars intended, or attempted, to turn at the intersection—the driver of the Wilson car intending to cross Sixth avenue and thence continue eastward on Union street, and the driver of the Mullen car intending to cross Union street and thence continue southward on Sixth avenue. A car approaching the intersection of Sixth avenue and Union, from the west, on Union street (as the Wilson car was) is running downgrade from Seventh avenue—the length of a city block.

It was stipulated on the trial that the ordinance of the city of Nashville, set out in that part of the declarations hereinbefore copied, was in force at the time of the accident in question, and it was also

stipulated that neither Union Street nor Sixth Avenue, at their intersection, was an "Arterial Highway."

There was evidence from which the jury could find that, from a point more than 200 feet west of Sixth Avenue to the point of the collision, the Wilson car was running at a speed of twenty-five to thirty-five miles an hour; that it maintained that speed to the point where it collided with the Mullen car near the "crossing or intersection" of Sixth Avenue and Union Street; that the front of the Mullen car had reached the line of the south curb of Union Street when it was struck on its right side, but near the rear end, by the Wilson car, and that the collision would not have occurred if the speed of the Wilson car had been no more than 20 miles an hour as it approached Sixth Avenue and had been reduced to ten miles an hour when it reached the crossing or intersection of Sixth Avenue and Union Street. It is obvious, therefore, that there was evidence to take the case to the jury for a finding as to whether the Stutz car was operated negligently, as charged in the declarations, and as to whether such negligence was a proximate cause of the collision.

The evidence we have stated was directly contradicted by the testimony of James Cates and Miss Wilson, the occupants of the Stutz car, but it is not within our province, as an appellate court, to weigh conflicting evidence in a jury case. There is, therefore, no occasion to extend this opinion by stating their testimony herein.

There is an abundance of testimony by plaintiffs' witnesses that the Mullen car approached and crossed Union Street at a speed of not more than seven or eight miles an hour, and therefore there was no violation by the plaintiffs' driver of the aforesaid ordinance regulating the speed of automobiles.

The argument on behalf of defendants, that the driver of plaintiffs' car was guilty of contributory negligence, is rested mainly upon the insistence that the proximate cause of the collision was the violation by plaintiffs' driver of an ordinance of the city of Nashville which, it was stipulated on the trial, was in force at the time of the accident in question. This ordinance reads as follows:

"Be it further enacted that at all intersections of streets, alleys, or other highways or thoroughfares of said city, the drivers or other persons in control of all vehicles as defined herein, shall give the right of way to any vehicle approaching from their right, except that all vehicles proceeding along the highways which are hereinbefore designated as 'Arterial Highways,' shall have the right of way over all vehicles crossing or turning into said 'Arterial Highways' from any other street, alley, or other thoroughfares."

The plaintiffs' witness, W. T. Courtney (a guest in the Mullen car) was seated beside the driver, and he testified, in substance, that when the Mullen car had almost reached the edge of Union Street,

and was about to enter upon the crossing, he saw the Wilson car approaching from the west on Union Street at a high rate of speed, and he said to the driver, P. H. Mullen, ''Be careful, here comes a car, it looks like running away.''

P. H. Mullen, the driver of the Mullen car, testified that he saw the Wilson car about the time Courtney made the cautionary remark just quoted, and saw that it was running fast; but that he was familiar with the traffic laws and ordinances, and, as the approaching car was then more than 200 feet west of the crossing, he assumed that the driver would reduce its speed and not attempt to cross Sixth Avenue while the area of intersection was occupied by other cars which had previously entered upon the crossing.

Witnesses for the plaintiffs also testified that the Mullen car was one of a line of cars moving southward on Sixth Avenue at a speed of about seven or eight miles an hour, and it was therefore practically impossible for its driver to materially increase its speed.

''Until the contrary appears, a motorist approaching or crossing a street intersection may assume that another automobile approaching on the cross street will do so at a moderate speed and under control, that he will not increase his speed, and that the other driver will observe traffic regulations with respect to speed, or otherwise.'' Blashfield's Encyclopedia of Automobile Law, page 489.

''Cars coming from right having right of way.—Certain States have passed laws giving the right of way when vehicles meet at the intersection of two streets to the vehicles approaching from the right. Such a regulation is designed to prevent accidents and not to excuse them and relieves drivers from no duty of care imposed on them before. One approaching a crossing is still bound to look to the left for approaching vehicles as well as to the right and if the vehicle approaching from the left reaches the crossing first, it has the right of way. The statute can only apply when the two cars reach the crossing simultaneously and when one car is already at the crossing the other has no right to run into it. The rule is however useful in determining liability in doubtful cases and in the case cited the driver coming from the left colliding with the other was held guilty of negligence, and that a driver entered on a crossing without looking to his right may be conclusive evidence of negligence.

''The driver having the right of way is not guilty of negligence in proceeding unless he sees or should see in time to avoid a collision that the other car is not going to respect his right of way, but he is negligent if he holds his course stubbornly although he sees that a collision is imminent although he has the right of way, as where he notices cars approaching from the left he is bound to watch them although he has the right of

way and must look for cars from the right, but he may not be negligent if he merely fails to observe the speed of a car approaching from the left.

"The rule does not apply where the vehicle approaching from the right was. so far away that the driver of the other vehicle had no reason to anticipate danger in crossing ahead of it, but one may be negligent in taking a chance of crossing ahead of a car approaching from the right a short distance away on a dark, rainy night with a slippery pavement." Babbitt on Motor Vehicles (3 Ed.), sec. 535.

"Before the enactment of regulations giving the right of way to a vehicle approaching from the right, it was generally held that one reaching the intersection distinctly in advance of another, whether from the right or left, had the right of way, and the later arrival should delay his passage to enable the prior arrival to cross in safety. . . .

"The right of way granted to the first arrival is not entirely abrogated by the later rules which give the right of way to the vehicle approaching from the right. The right of way accorded to the vehicle from the right comes into effect when both vehicles reach the intersection at the same time, or so nearly the same time, that a collision would be anticipated if both continued their course. If the vehicle from the left reaches the intersection so far in advance of the one from the right, that its driver is justified in believing that he can cross without a collision, he has a right to continue, and to that extent may be said to have the right of way. It is, of course, true, however, that the older rule has been to some extent modified by the modern regulations." Huddy on Automobiles (7 Ed.), sec. 307.

"The one who arrives at the intersection first is ordinarily entitled to the right of way, regardless of statute or ordinance giving the right of way to one or the other. Such provisions usually apply only when both arrive at the intersection at approximately the same time." Berry on Automobiles (5 Ed.), page 725.

"The operator of a motor vehicle is not bound to anticipate negligence of those in charge of other vehicles; but in the absence of any circumstances which reasonably should put him on notice to the contrary, he has the right to assume and to act on the assumption, that other users of the highway will exercise reasonable and ordinary care and observe the rules of the road and traffic regulations." 42 C. J., page 884, sec. 584.

The term "intersection," as used in a statute or ordinance with respect to the right of way as between vehicles approaching an intersection, means the entire space which is common to the two intersecting highways or streets. 42 C. J., page 975, sec. 704.

"Regulations with respect to the right of way at intersections must, however, receive a reasonable construction, and a driver is not in all cases under a duty to yield the right of way to another driver merely because the latter is traveling in the favored direction. Thus a driver driving in the disfavored direction is not required to wait for the passage ahead of him of a vehicle approaching from the favored direction where it is reasonably apparent that he can cross ahead of such vehicle with entire safety, and he is, accordingly, warranted in proceeding across an intersection which he reached so much in advance of a vehicle approaching from a favored direction that he has ample time to cross the intersection at a reasonable speed before the other vehicle enters it or that a reasonably prudent man under like conditions would attempt to cross in front of the approaching vehicle. It has often been considered that the vehicle traveling in the disfavored direction has the right to proceed if it reaches the intersection substantially in advance of the other vehicle. A fortiori, a driver is not required to wait before undertaking to cross an intersection until there is no vehicle in sight approaching from such direction as to be entitled to the right of way. Whether it is the duty of a driver proceeding in the disfavored direction to yield the right of way to a driver proceeding in the favored direction, depends upon the circumstances of the particular case, and various elements are to be considered, including the relative distance of the two vehicles from the intersection, and the relative speeds at which they are approaching. Accordingly, failure to yield the right of way to a vehicle proceeding in the favored direction is not necessarily negligence as matter of law, but is a fact to be considered along with the other facts in the case on the question of negligence." 42 C. J., pages 984-986.

The case of Primock v. Goldenberg (Minn.), 37 A. L. R., 484, is in point. The case is stated in the headnote as follows:

"Defendant, in a street intersection automobile collision case, was approaching from plaintiff's right. Plaintiff held not guilty of contributory negligence as a matter of law simply because he admitted that when he entered the intersection he observed defendant approaching 125 feet away at 35 miles an hour,—such a speed that, if both proceeded into the intersection, there would be a collision. The statutory right-of-way rule does not absolve a chauffeur, approaching too rapidly from the right, from the duty of slowing down, and otherwise using due care for the protection of others at and on the intersection. The finding that plaintiff was not negligent as a matter of law is justified, because he had a right to assume, he being first on the intersection, that defendant would reduce his speed so as to permit plaintiff to clear the crossing in safety."

The facts of the case of Burdette v. Henson, 96 W. Va., 31, 37 A. L. R., 489, 122 S. E., 356, are strikingly similar to the facts of the instant case. It was there held that the driver approaching from the left is not required to stop and give way to a vehicle in the distance coming on his right, where he has no reason to anticipate that he cannot cross the intersection in safety, but may assume that the other will exercise due care in approaching and crossing the intersection.

See also, Annotations, as follows: 21 A. L. R., pages 975 and 982, et seq.; 37 A. L. R., pages 494 and 502, et seq.; 47 A. L. R., pages 596 and 603, et seq.; and Petring v. Albers (Mo.), 241 S. W., 452; Heidle v. Baldwin (Ohio), 161 N. E., 44; Hughes v. Hudson-Brace Motor Co. (Kan.), 207 Pac., 795; Barnes v. Barnett (Iowa), 169 N. W., 365; Lee v. Pesterfield (Okla.), 188 Pac., 674.

We are satisfied that, upon the evidence in this case, it could not properly be held, as a matter of law, that the driver of. the Mullen car was negligent in proceeding across Union street at its intersection with Sixth avenue, as he did, without waiting for the Wilson car to pass the crossing.

For the reasons stated we hold that there was evidence to take the case to the jury and to support the verdict of the jury in favor of the plaintiffs, and against at least two of the defendants. Whether plaintiffs were entitled to a verdict against the defendant Elizabeth Dake Wilson is questioned under a subsequent assignment of error, and will be discussed later herein. Passing the third assignment of error for the present:

The fourth assignment is that the trial court erred in refusing to charge the defendants' special request number three as follows: "Gentlemen of the jury: the violation of a city ordinance, when the injuries complained of occurred in the city where said ordinance applies, is negligence in itself; and if you find from a preponderance of all the evidence that the injuries sued for in these cases were the proximate result or consequence of the negligent act in violating such ordinance, if you so find such ordinance was violated by the plaintiffs, or the driver of their car, then there would be no liability on the part of defendants, and your verdict should be for the defendants."

When read in the light of the evidence before the jury, this request obviously referred to the aforementioned ordinance providing that, at the intersection of streets, a car approaching from the right should have the right-of-way.

Concerning this ordinance, the trial judge charged the jury as follows:

"They (the defendants) further insist and say that this Mullen car in question was violating a City Ordinance which prescribes at the intersections of streets, that a car approach-

ing from the right should have the right-of-way. They say that this Mullen car did not observe this City Ordinance; they say, that as a matter of fact, instead of giving the right-of-way as it was their duty, when they were approaching with the Mullen car going south on Sixth avenue and the Wilson car going east on Union street, (that would throw the Wilson car to the right of the Mullen car) that they did not give them the right-of-way as provided by this City Ordinance, but as a matter of fact they violated it and came across, and that it was the direct and proximate result of such violation that this accident followed.

"Now, if that insistence is the true state of facts in the case, and is so shown by a preponderance of all the evidence in the case, then your verdict will be in favor of all of these defendants."

The charge thus given to the jury gave the defendants the full benefit of the proposition which it was sought to embody in the above quoted request, and gave it in a concrete form which the jury could understand more readily than in the form stated in the request. The fourth assignment of error is overruled.

Through their fifth, sixth, seventh and eighth assignments the defendants complain of the action of the trial court in refusing to give in charge to the jury their special requests for instructions numbered four, six, five and seven, respectively.

These requests are amplifications, in different forms, of request number three above copied, relating to the aforesaid right-of-way ordinance, and the assignments complaining of their refusal are overruled for the same reason that we have heretofore overruled the fourth assignment of error, supra.

The ninth assignment is that the court erred in refusing to charge defendants' special request number eight, as follows:

"If you find from a preponderance of the evidence in these two cases that both the plaintiffs and the defendants were guilty of negligence, which proximately contributed to the accident, however slight the degree, then your verdict should be for the defendants."

The law on the subject embraced in this request was sufficiently charged, and the ninth assignment is overruled.

The tenth assignment is that the court erred in refusing to charge defendants' special request number nine as follows:

"If you find from a preponderance of the evidence. that even though defendants were guilty of negligence in coming to the intersection of said street, but that plaintiffs saw defendants' car thus approaching and plaintiffs' car was far enough away and coming at such a slow rate of speed that it could have been stopped before getting in the path of defendants' car, and plaintiffs' driver having this last clear chance, if you so find, failed

to bring his car to a stop in order to avoid said collision, even though he had time to do so, and as a result the collision occurred, then, in that event your verdict should be for the defendants.''

We do not think there is any evidence in this case which affords a predicate for the application of the "last clear chance" doctrine on behalf of defendants, and the tenth assignment is overruled.

The eleventh assignment is that ''The court erred in not granting motion for a new trial, in that, the verdicts were excessive; and so excessive as to evince prejudice, passion or caprice on the part of the jury.''

In the brief, the learned and able counsel for defendants has offered no argument in support of the eleventh assignment, supra, and, after an examination of the entire record, we find no reason to conclude that the jurors were moved by prejudice, passion or caprice, or that they abused the discretion which the law vests in them for the assessment of the damages which shall be awarded to injured plaintiffs in cases of this character.

In the case of Power Packing Co. v. Borum, 8 Tenn. App. Rep., 162, 180, this court said:

''In a personal injury case, such as we are now considering, the law furnishes no standard by which to measure the compensation to which a successful plaintiff is entitled, but confides the amount of the damages to be awarded to the judgment of impartial jurors, guided by the facts and circumstances of the particular case. Then, before the case comes to this court, the verdict is subject to the scrutiny of the trial judge. As said in the case of Quinn v. Railway Co. (Minn.), 46 A. L. R., 1228: 'In determining whether a verdict is so excessive that a new trial should be granted, much responsibility rests on the trial judge. He is called upon to exercise a practical and sound discretion. This court does not readily substitute its judgment for his, for he is in a far better position to come to the right conclusion than we are. Properly enough, we defer to his judgment and do not interfere, unless it is fairly evident that he failed to keep the jury within the bounds of reason and common sense.' ''

The foregoing comments in Power Packing Co. v. Borum are applicable in the instant case. The eleventh assignment of error is overruled.

This leaves for disposition only the third assignment of error which is that the court erred in charging the jury, without qualification, ''If you find in favor of the plaintiff, it will be your duty to find against all three defendants.''

It is true that the instruction quoted in the third assignment, supra, may be said to have been ''without qualification.'' However,

332

it will conduce to a better understanding of the viewpoint of the learned trial judge to include the context in the quotation as follows:

"If you should find in favor of the two defendants who were in the Wilson car, Miss Wilson and James Cates, this would relieve the other defendant, R. Morris Wilson, and your verdict should also be in his favor, as his liability is dependent on liability on their part.

"If you find against the plaintiff, Mrs. Kate Mullen, it will be your duty also to find against the plaintiff, J. B. Mullen, and if you find in favor of the plaintiff, Mrs. Katie Mullen, you should also find in favor of the plaintiff, J. B. Mullen.

"If you find in favor of the plaintiffs, it will be your duty to find against all three of the defendants."

The defendant R. Morris Wilson was introduced and examined as a witness for plaintiffs. His entire testimony is brief, and is as follows:

"Direct Examination.

"By Mr. Daniel, for the plaintiffs.

"Q. This is Mr. Morris Wilson? A. Yes, sir.

"Q. You are one of the defendants in the case? A. Yes, sir.

"Q. You have been here during the progress of the trial, up to now? A. Yes, sir.

"Q. Your initials are R. M. Wilson? A. Yes, sir.

"Q. Your automobiles are registered in the name of R. M. Wilson? A. Yes, sir.

"Q. And the M. is for Morris? A. Yes, sir, Morris.

"Q. And you are generally known, as R. Morris Wilson, or Morris Wilson? A. Yes, sir.

"Q. The defendant, Miss Elizabeth Dake Wilson, is your daughter? A. Yes, sir.

"Q. Where do you live, Mr. Wilson? A. On the Franklin Road.

"Q. And your daughter lives with you? A. Yes, sir.

"Q. Is she the only member of your family that lives with you? A. Yes, sir.

"Q. You and your wife are not living together? A. No, sir.

"Mr. Handly. I object to that as immaterial.

"The Court. Yes.

"Mr. Daniel. I am getting at another matter, may it please Your Honor.

"Q. You have how many automobiles registered in your name, and how many in your wife's name? A. I have none registered in my wife's name.

"Q. She has one registered in her own name? A. Not that I know of.

"Q. Anyhow, you have two registered in your name? A. Yes, sir.

"Q. That you use, and then the one that your daughter uses? A. Yes, sir.

"Q. What was the license number of the one in use by your daughter on the occasion of this accident? A. I could not recall the license number.

"Q. Well, it was a Stutz car? A. Yes, sir.

"Q. And the license number would be indicated by' the number issued by the County Court Clerk's office, where you procure license? A. Yes, sir.

"Q. But you know about the date, you did not see this accident? A. No, sir.

"Q. Where were you when it happened? A. I was at home.

"Q. Your daughter was using this car that night? A. Yes, sir.

"Q. That was the same car that you had provided for your daughter? A. I bought it for my daughter purposely.

"Q. Exactly, and she was using it? A. Yes, sir, she used it entirely, I gave it to her.

"Q. And it was kept at your place? A. Yes, sir.

"Q. And registered in your name? A. I think it was registered in my name, I wouldn't be positive, I think I did it, to save her the trouble, she is lame, etc., and I think it was registered in my name. I wouldn't swear to that, though.

"Mr. Handly. I think that is true, and we will concede it, that it was registered in the name of R. M. Wilson.

"Mr. Daniel.

"Q. And you bought it and paid for it? A. Yes, sir.

"Q. And your daughter was using it with your permission? A. Yes, sir.

"Q. The car that you generally use is a different make of car? A. Pardon me, I didn't catch that.

"Q. The car that you used ordinarily in your business was a different make of car? A. Yes, entirely different car, it was a Marmon.

· "Q. A Marmon car? A. Yes, sir.

"Q. Where were those two cars kept? A. In my garage.

"Q. Who furnished the chauffeur or porter? A. Well, whenever the chauffeur goes out with her, I furnish it.

"Q. Exactly, who furnished this car that your daughter was using, who furnished the upkeep of it? A. I do.

"Q. And the oil and gasoline and everything? A. I do.

334

"Q. And your daughter was living there with you? A. Yes, sir.

"Q. The automobile was kept there on your place? A. Yes, sir.

"Q. And your chauffeur, or driver drove her out with it whenever she needed your chauffeur? A. Yes, sir.

"Q. And you furnished oil and the gasoline, and any repairs, or anything like that, you furnished? A. Yes, sir.

Cross-Examination

"By Mr. Handly, for the defendants.

"Q. Mr. Wilson, in fact, you repaired the car, after this accident, your car had to be repaired? A. Yes, sir, I had it repaired.

"Q. Now that particular night, who is this young man here? A. Mr. Cates.

"Q. And that particular night you let Mr. Cates and your daughter go to the show? A. Yes, sir, they asked if they could go to the theatre, and I told them they may.

"Further this deponent saith not."

We also quote excerpts from the testimony of defendant Elizabeth Dake Wilson, a witness for defendants, as follows:

"By Mr. Handly, for the defendants.

"Q. This is Miss Elizabeth Wilson? A. Yes, sir.

"Q. How old are you, Miss Wilson? A. Nineteen.

"Q. Mr. Morris Wilson here is your father? A. Yes, sir.

"Q. You live with him? A. Yes, sir.

"Q. Miss Wilson, on the night in question, which I believe was October 1st, your father let you and Mr. Cates go to the theatre? A. Yes, sir.

"Q. Mr. Cates was out there, calling at your home? A. Yes, sir, daddy was going with us, but he did not feel like it, so he stayed at home.

"Q. He let you go? A. Yes, sir.

"Q. What car were you driving, Miss Wilson? A. The Stutz.

"Q. Now, where were you going? A. Going to the Orpheum Theatre.

"Q. Now, with respect to your father's office, what were you going to do with the car, if this accident had not occurred? A. Going to park it down at daddy's office.

"Q. Is that in the alley east of Sixth Avenue, back of his office on Sixth Avenue? A. Yes, sir." . . .

"Q. And who was driving the car? A. Jim Cates.

"Q. Had he driven this car before? A. Yes, sir, a great deal."

Cross-Examination.

"By Mr. Daniel, for the plaintiffs.

"Q. You say you cannot drive like a maniac? A. No, it is impossible.

"Q. Did you ever try it? A. No.

"Q. Did Mr. Cates ever try it? A. No, not with me, in my car.

"Q. Well, he was driving your car, was he not? A. Yes, sir.

"Q. And you were by his side? A. Yes, sir.

"Q. He was doing it with your permission, and under your direction? A. Yes.

"Q. You had real control of your car yourself? A. It was my car, do you mean that way?

"Q. You had control of it? A. No, I didn't have my foot on the brake.

"Q. You had control over the driver who drove it, didn't you? A. I suppose I did.

"Q. How is that? A. Yes. . . .

"Q. You say Mr. Cates had driven that car a great many times? A. A great many times.

"Q. Driving it out from your and your father's home? A. Yes, sir."

We also quote excerpts from the testimony of defendant James Cates as follows:

"By Mr. Handly, for the defendants.

"Q. What is your name? A. James Cates.

"Q. How old are you? A. Eighteen.

"Q. Where were you born and reared? A. Out on the Lebanon Pike.

"Q. In Davidson County or Wilson County? A. Wilson County.

"Q. Who was your father? A. Fred M. Cates.

"Q. How long have you known Miss Elizabeth Wilson? A. About two years.

"Q. Do you know their Stutz car? A. Yes, sir.

"Q. And have you called at their home frequently? A. Yes, sir.

"Q. Have you or not driven that Stutz car? A. Yes, sir.

"Q. Much or little? A. Very much.

"Q. What experience have you had in driving automobiles? A. About four years.

"Q. What other cars have you driven besides this Stutz? A. Ford and Essex and Dodge."

Cross-Examination.

"By Mr. Daniel, for the plaintiffs.

"Q. How long have you been a visitor out at the Wilson home? A. About two years.

336

"Q. Two years; how often do you carry Miss Wilson out driving? A. Quite often.

"Q. Well, how often? A. Two or three times a week.

"Q. That has been continued for how long, you say two or three years? A. About two years, not continuous.

"Q. Do you go day or night? A. I don't mean I have been going to see her two or three times a week all the time for two years; I have been knowing her for two years.

"Q. Well, how long have you been going to see her two or three times a week? A. About six months.

"Q. Been pretty well acquainted? A. Yes, sir.

"Q. And she let you drive this car on this occasion? A. Yes, sir.

"Q. You would not want to say anything here that would get her into trouble, would you? A. No, sir, certainly not.

"Q. That might get you into trouble, mightn't it? A. I don't know.

"Q. Well you are still visiting out there three times a week, aren't you? A. Yes."

The foregoing testimony of the three defendants, respectively, has been quoted for the reason that it discloses the relations between them, and the relation which, at the time of the collision, each of them bore to the Stutz car which inflicted the injuries upon the plaintiffs. There is nothing in the record which contradicts the testimony thus quoted.

It thus appears, without dispute, that the Stutz car was being used, at the time of the collision, with the authority of the owner, the defendant R. Morris Wilson, and in the precise business for which he had bought it and for which he was at that time keeping and furnishing it. His liability, therefore, seems clear. King v. Smythe, 140 Tenn., 201, 204 S. W., 296; L. R. A. 1918F, 293; Meinhardt v. Vaughn (Tenn. Sup. Court), 17 S. W. (2d), 5.

Defendant James Cates was admittedly the driver of the Stutz car, and, according to the evidence for plaintiffs, the proximate cause of the collision, and the resulting injuries to plaintiffs, was his (Cates') personal negligence, for which he was, under well-settled principles, legally liable in damages.

It does not appear that either of the minor defendants sought to interpose their minority as a defense to these actions, but "it is the right and duty of the court to protect the interests of an infant party to litigation on its own motion, whether he be a plaintiff or defendant, whether the proper relief is asked in the pleadings or not, and whether the claim or defense be properly pleaded or not." 31 C. J., page 1115, sec. 254.

But "the general rule is that an infant is responsible for his torts, as any other person would be." Cooley on Torts (2 Ed.), p. 120.

"A blow by a youth of eighteen may inflict as serious an injury as a blow by a man of mature years," and "if, therefore, redress is the object of the law, the party injured should have the same redress in the one case as provided for him in the other." Idem, page 114; See also, Lowery v. Cate, 108 Tenn., 54, 58, 64 S. W., 1068, 57 L. R. A., 673; 31 C. J., pages 1093-1094, sec. 209; 16 Ency. of Law (2 Ed.), page 307; Bigelow on Torts (8 Ed.), page 45; Note 57 L. R. A., page 673; Note 35 L. R. A. (N. S.), page 574.

"An infant, being liable for his torts, may of course be sued therefor." 31 C. J., page 1115.

Defendant Elizabeth Dake Wilson (also a minor—19 years of age) was not driving the Stutz car, but she was seated beside the driver, who was driving with her permission and was subject to her control. Since the creation of an agency involves a contract and, therefore, a minor cannot lawfully appoint an agent, it is generally held that a minor may not be made liable for the tortious acts of one to whom he has undertaken to delegate authority to act as his agent. 31 C. J., pages 1090-1091, sec. 203; 14 R. C. L., page 260.

But the rule just stated does not apply where, as in this case, the driver was acting in the immediate presence and subject to the direction of the minor who had authority to control his operation of the car. In 22 Cyc., at page 620, it is said: "It has been laid down that in order to hold an infant liable for a tort, the tortious act must be committed by the infant or under his immediate view, or by his direction or authority. For as he cannot create an agency or appoint a servant and therefore cannot delegate power to another, he cannot guarantee or insure the fidelity, care, or skill of such other."

In the case of Thrasher v. Bratton, 6 Hig., 454, a minor owner of an automobile was held liable for the negligence of his chauffeur, resulting in injuries to a pedestrian. It was there held that the fact that the negligent act was committed by the chauffeur in the presence of the minor employer, took the case out of the general rule that "persons under disability are not liable for torts committed by their agents."

The principle on which the ruling in Thrasher v. Bratton, supra, was rested (as we understand that case), has been frequently applied by the courts of other jurisdictions in cases (not involving minors) wherein it was sought to hold the owner of a vehicle liable for the negligence of a stranger who had been permitted by the servant of the owner to drive the vehicle in the immediate presence of the servant. Such holdings are "based upon the reasoning that the stranger is a mere instrumentality by which the servant or agent performs his duties, a longer arm which the servant or agent wields or controls; that the master's business is being performed, therefore, by the agent or servant through the stranger in question." See Elkin

Motor Co. v. Ragland, 6 Tenn. App. Rep., 166, 173; Ulman v. Linderman (N. D.), 10 A. L. R., 1140; Annotation, 44 A. L. R., 1385.

We are of the opinion that the court did not err in charging the jury that "if you find in favor of the plaintiffs, it will be your duty to find against all three defendants;" and the third assignment of error is overruled.

It results that the judgments of the circuit court are affirmed, and a judgment will accordingly be entered in this court in favor of each of the plaintiffs and against the three defendants, with interest on each judgment from the date of its rendition in the circuit court, and for the costs of the cause accrued in the circuit ourt. The costs of the appeal will be adjudged against the defendants and the surety on their appeal bond.

Crownover and DeWitt, JJ., concur.